The United States Court of Appeals for the Sixth Circuit is now in session. All persons having business before this honorable court draw near, give attention, and ye shall be heard. God save the United States and this honorable court. Case number 20-34-47. I'm sorry, Judge, did you want to... No, no, no, please continue. Okay. Case number 20-34-47, Craig Wilson v. Mark Williams, arguments not to exceed 15 minutes per side. Ms. Carroll, you have received the appellants. Good afternoon. Good afternoon, Your Honor. May it please the court, Sarah Carroll on behalf of the Federal Bureau of Prisons. The COVID-19 pandemic has imposed extraordinary risks on the entire world. There are special challenges in places where large groups of people live or work such as nursing homes, factories, warehouses, prisons. Recognizing this, when the first cases of the virus were detected in the United States in January, BOP implemented a multi-phase plan to rely on guidance from the Centers for Disease Control and other authorities. The plan evolved as the pandemic evolved, and at the time that the district court issued the preliminary injunction in this case, BOP had done things such as implement isolation, quarantine, and testing procedures in reliance on the guidelines, minimize movement of inmates within and between facilities, provide inmates with masks, provide staff with other protective equipment. Despite all of this, the district court issued an extraordinary preliminary injunction on April 22nd that requires the transfer of many hundreds of inmates to other facilities besides Elkton Federal Correctional Institution, to facilities that potentially are not at the right security level for them, are far from their homes and their families, potentially do not have the resources or programs that they need. The district court exceeded its authority in numerous respects. First, the preliminary injunction is outside the court's habeas jurisdiction. This court has made clear that challenges to conditions of confinement are not cognizable in habeas, and this case falls into that category. Petitioners tried to evade that restriction by characterizing this as a challenge to the fact of their confinement, but that's simply not correct. A premise of petitioners' claim is that they can be confined somewhere, it just has to be somewhere other than Elkton, and the relief that the district court granted is simply transfer to other facilities. It will not change the fact that the petitioners are confined. And because of that error, the district court also failed to even really acknowledge, much less grapple with, the careful limitations that Congress imposed in the Prison Litigation Reform Act. The Prison Litigation Reform Act imposes carefully reticulated requirements on civil suits challenging prison restrictions, sorry, prison conditions. For example, the relief must be narrowly tailored, no broader than necessary. Courts have to impose sort of increasingly intrusive relief and find that something less intrusive is insufficient before they order something more intrusive, not to mention a prisoner release order, which has to be challenging the fact or duration of confinement. But again, this is not such a case. And Brown v. Plata, the Supreme Court's decision, makes that clear. In Brown v. Plata, the court evaluated a prisoner release order. The court noted that the order allowed for potential transfer of inmates to other prisons. It didn't, you know, strictly require that inmates be released from custody altogether, but the Supreme Court nonetheless had no trouble concluding that it was a prisoner release order. And petitioners do not even attempt to explain why that reasoning does not apply here. The district court's order is also completely unmoored from any Eighth Amendment analysis that the Supreme Court has ever conducted or blessed. The Eighth Amendment prohibits only the wanton infliction of pain. It prohibits punishment. And it applies where risks to inmates are risks that our contemporary society would not tolerate imposing on anyone. But again, as I mentioned, the COVID-19 pandemic is creating risks for everyone in the world and risks of, you know, related to communal living for a lot of people outside prisons and outside of Elkton. Ms. Carroll, I do have a quick question. I really, I think it's maybe just about the record. When I look at the injunction itself, it requires the respondents to identify all members of the recall. And that list of 837 medically vulnerable people over prisoners over a certain age has been provided. Is that correct? Yes, that's right, Your Honor. So the second thing that it says is, following identification, the court orders respondents to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole, or community supervision, transfer, furlough, or non-transfer furlough within two weeks, which I understand would take you to May 7th. I believe that's right, Your Honor. Yeah. So the second requirement is the evaluation for eligibility for transfer. Is that ongoing or has that occurred as of now? That has been completed, Your Honor. BOP has done that already. And in fact, BOP then evaluated everyone again for home confinement pursuant to the district court's May 19th order. But BOP certainly has complied with the second element of the preliminary injunction. Okay. So the only thing left then is for decisions to be made about what happens to prisoners from that point, whether there would be some sort of a transfer, furlough, parole, compassionate release, things of that nature. Right. So the preliminary injunction, as opposed to the May 19th order, only requires that BOP evaluate everyone for those types of things that Your Honor described, and then transfer anyone who is not determined to be eligible for those things. So the only remaining obligation under the preliminary injunction is to transfer all of the people who have been found ineligible for things like home confinement. So that gets me to the next question I had. The matter before us today is the April 22nd order. How are we to view the May 19th order if at all that order enforcing this order is not before us? That's right, Your Honor. That order is the subject of a separate appeal, and we have not yet briefed that order. We do think that if this order is vacated, the April 22nd order, as we think it should be, the May 19th order necessarily also falls because, as Your Honor noted, it's an order enforcing the April 22nd order. So if there's nothing to enforce, there's no basis for the May 19th order. But if the court were to disagree with that or were to uphold the April 22nd order, then I expect that the appeal of the May 19th order would need to proceed. Okay, and then so that I understand it, and I hope to assume both parties agree, identification has occurred, evaluation has occurred. Apparently, there is some internal decision made by BOP and the warden as to where these 837 or whatever the number of prisoners is should go or what should be done with them. And then what in the order, so is there a date by which these things have to occur in your But we interpret the order to require that BOP transfer people who are found ineligible for the other things as quickly as possible. And the district court made clear that people needed to be quarantined before they were transferred. So BOP put people into quarantine, not all 800 people, because that's not possible within the constraints of Elkton, but 100 some people in So people were going to be transferred today. But as I know, the court is aware, the Supreme Court issued a stay yesterday evening. So as of now, no transfers are taking place. Well, I think you were going to talk about the Eighth Amendment and maybe the sort of sub issue and their deliberate indifference would be the, for my purposes, the subjective problem. I maybe want to hear about that in the time that you have. Sure. So the subjective problem of the Eighth Amendment, as I'm sure your honor is aware, requires a pretty high standard, it requires deliberate indifference, what the Supreme Court has described as the wanton infliction of pain. It's not, you know, for example, a negligence standard. BOP has been working diligently has been working tirelessly for the past few months to protect inmates. I mentioned at the beginning, numerous steps that BOP has taken, it has been relying on advice from the CDC and other authorities. And the district courts basis for finding that BOP had been deliberately indifferent are really pretty thin. The district court said, there has been transmission of COVID-19 at Elkton, as the fifth and 11th circuits recently said in Valentine and Swain, that is not enough, that there is this extraordinary virus going around the entire world and the mere presence isn't enough. The district court criticized BOP's testing, the amount of testing that was being done. Ms. Campbell, Ms. Campbell, could I ask a question, please? What standard of review is required by this court for assessing the appropriateness of the district court's decisions there with regard to deliberate indifference? Well, a preliminary injunction in general is reviewed for abuse of discretion, but of course, legal issues are reviewed de novo. So I think that to the extent the district court misapplied the law and misunderstood what the deliberate indifference standard is, which we think it did, the standard would be de novo. I see that my time has expired. I'm happy. We'll take another three or four minutes because there may be some more questions. Thank you. So continuing where I left off, the district court also criticized BOP for the amount of testing that was going on at Elkton at the time of the preliminary injunction. But BOP had submitted a declaration that was before the court at that time explaining that BOP was working diligently to get more tests. That's paragraph 43 of the D's declaration, page ID 183. To the extent the district court perhaps didn't believe that, the Congress has recognized since then in the CARES Act, section 12003B, that BOP did in fact have trouble procuring tests because it was competing on the market against everyone else who was trying to get tests early in the pandemic. So there's no basis to think that BOP was just sitting around deliberately indifferent thinking, hmm, it'd be good to have more tests, but we're not going to try to get them. The district court also criticized BOP- Is that legitimately part of the record here, counsel? I'm sorry, Your Honor. Yes. The fact that BOP was diligently working to get more tests absolutely is part of the record. I know, but you talked about the Congress' recognition recently. What about that act? I don't remember exactly- I'm sorry, Your Honor. I don't remember exactly what date the CARES Act was passed, but certainly that's a statute. That's a finding of Congress that this court has free latitude to take notice of. Wasn't the CARES Act enacted in March? So it predated on this litigation. Is that right? That sounds right to me, Your Honor. I honestly don't remember the date, so I can't be sure, but March sounds right to me. And then the district, if you don't mind- I do have a point to interject. Does the record reflect, or can you just make clear why it took the BOP, or maybe Elkton specifically, or why it's taking so long to get testing? I know tests have been hard to obtain nationally. We've heard a lot about that in the media, but your other side has pointed out that some of the state prisons, like the Marion Correctional Prison, which is probably 30 miles up the road from where I'm sitting right now, they tested 2,000 out of 2,500 prisoners, I think, you know, early to mid-April. Was the state just better able to get these tests than the BOP, which is trying to serve prisons in 50 states? Just kind of wondering why it's taking so long. Your Honor, it's a good question. I don't know the answer offhand. I know that the declarations show, you know, the series of declarations that BOP submitted, both before and after the preliminary injunction, show that BOP was steadily obtaining more testing capacity. I think at some point it got a testing machine, and then maybe the machine was taken away, and I don't know, Your Honor, if that's, you know, as you note, because of the fact that BOP has facilities everywhere, I'm not sure. But, of course, the fact is now that BOP is doing mass testing at Elkton, has tested everyone at Elkton, and even if— All 2,500 or so prisoners have been tested? That is what I'm told. The last thing in the record is a filing from, I believe, the middle of last week that said that BOP expected to have tested everybody by last Friday, so a week ago, and BOP tells me that that has, in fact, happened. That's what I know. I have one last question, and I'll just be, you know, candid. This is what—a couple things that bother me in terms of this prong and has me concerned in terms of the issue of deliberate indifference on the part of your clients, is the Attorney General sent two memos, I think, one in March, like March 26, and another in April 3, that seemed to emphasize that the prison should prioritize home confinement. That was the first one. The second one mentions increasing the use of home confinement, and from what I can see from the record, at least as of April 22, but it seems really May 19 and maybe beyond, Elkton has only approved something like five out of—I don't know how many prisons have applied for it, but it was a pretty good number—has only approved five, I think, and maybe one for compassionate release. They've not been able to do social distancing. It looks like the layout is just not conducive to that, and so I'm concerned that, you know, this virus will just run, you know, rampant through the prison if you can't socially distance. I acknowledge prisons are a tough venue for that, but you've got the Attorney General directing Elkton, as I understand it, to focus more on home—on home confinement. I don't see that that's happened. So that's my last question. I know your time has expired. Sorry to ask so many questions, but that—if you ask me, what—those are the two things that are troubling me. You still don't have social distancing, and you've got an Attorney General who has directed the—the BOP and the warden to—to focus on something that I can't—I can't tell from the record that's happened. Okay, so on the first question about social distancing, first, the Supreme Court, of course—so first, starting from an assumption that social distancing is not possible at Elkton, the Supreme Court emphasized in Wilson v. Sider that any Eighth Amendment inquiry has to take account of the constraints facing officials, and the capacity and layout of the prison is a very real constraint facing officials. I would also point out this—this postdates the PI, and of course this is not necessary to vacate the PI, but I want to point out just to respond to sort of a premise of your question, that the—the data shows that things are getting significantly better at Elkton. There was a spike of in hospitalizations in early April, but even at the time the PI was issued, hospitalizations were sharply declining. They've declined significantly since then. I believe there have been five hospitalizations since April 12th, only one since May 2nd, and I'm not saying that five hospitalizations is not serious. Of course, that's a big deal, and BOP is trying to prevent any hospitalizations, but it—it does not align with the sort of catastrophic narrative that the district court and the petitioners seem to have adopted. As for Your Honor's second question about use of home confinement, it's true that the Attorney General directed BOP to prioritize consideration of home confinement at Elkton and two other facilities, as well as elsewhere in the country, but he emphasized that BOP needed to continue doing the careful case-specific analyses it always does under its existing factors. He emphasized that BOP could not take any risk of letting someone onto home confinement if that would threaten the public, so he did not direct BOP to change its criteria for granting home confinement or anything like that. He just said— I understand that. Okay, so if it's—I—I agree, Your Honor, that not that many people from Elkton have been granted home confinement, but as the record explains, numerous inmates at Elkton are sex offenders, and sex offenders are generally considered ineligible, which I think is an entirely reasonable public safety determination. A number of other subclass members have histories of violent offenses. That, too, generally renders someone eligible for home confinement, so I think the facts show facts about eligibility, not about BOP's failure to do something it should be doing. All right. Thank you, Ms. Carroll. You'll have your five minutes of rebuttal. Thank you very much, Your Honor. Mr. Carey, you're up next. Thank you, Your Honor. May it please the Court, my name is David Carey of the ACLU of Ohio, and I'm representing the habeas petitioners. On April 22nd, the district court had in front of it an extraordinary fact pattern. We're all familiar with the COVID-19 pandemic, but here was a low-security prison in the throes of one of the worst outbreaks of COVID-19 in any prison in the country, with six people dead as of the time of the April 22nd injunction, and the government refusing to move even the most medically vulnerable people to safety. So the question today is whether the district... Mr. Carey, Mr. Carey, let's talk a little bit about moving people. According to Ms. Carroll, you know, right now what we're primarily talking about is transferring people, and even if habeas, the habeas statute 2241, even if it's an appropriate vehicle for some kind of release, how can it be an appropriate vehicle to get inmates transferred from one facility to another? The answer, Your Honor, is that it's a subset of the fact or duration of confinement aspect of habeas. So this court has observed in other contexts... No, no, no, you're asking to have inmates transferred to other institutions, which, as Ms. Carroll pointed out, may or may not be... You might be seeking to move a number of inmates to more confining situations because you could... I mean, under your request, we could have people moving from low to medium security. We could have them moving from a facility that's particularly appropriate for them, maybe it's near relatives, to someplace that's not. I mean, and they're not being released from anything. They may be going to more burdensome confinement. So how do we get that under 2241? 2241 contemplates a quantum change in confinement. And going back to In re Bonner... What's a specific... Do you have any specific case authority that says 2241 is okay to transfer inmates? This court has recognized that place of confinement may fall under 2241. So Jalili, United States versus Jalili. And also going back to the Supreme Court's decision in In re Bonner. So a quantum change in the confinement is cognizable under 2241. So the fact that it's transfer to another institution is still a reduction in the confinement in the sense that the person is no longer able to be confined within Elkton. So that is... It could be categorized as a place of confinement, or it could be categorized as a lesser form of confinement, both in the sense that they are no longer in this prison that is suffering the COVID outbreak, but also in the sense that the government can no longer keep them confined in that particular place. So that is something that this court has observed in the context of United States versus Jalili, and that is consistent with going back to older case law such as In re Bonner. So the declarations in front of Judge Gwynne, though, show that why this is necessary. Because again, we're looking at a prison that has 150 person units, where there's an open plan, people are moving around freely. And within that area, it is undisputed that social distancing is impossible. Prisoners are brushing past each other. They are, when they're brushing their teeth, they're bumping elbows with each other. And as we are aware from the CDC guidance, from public health authorities, and from experts in this case, social distancing is indispensable. So this brings us back to habeas, because there is no conditions change within the prison that would remedy the constitutional injury, because the social distancing is absolutely indispensable. And this is something to Chief Judge Cole's point earlier, that the Attorney General recognized in the May 3rd, excuse me, the April 3rd memorandum, and pointing out that they must maximize the use of home confinement with dispatch. That is a form of social distancing. That is a tool at the government's disposal to enable social distancing. So the government has gone through the requirements of PLRA. But the question here initially, because PLRA exempts fact and duration of confinement claims within habeas, is not does PLRA apply, but whether habeas applies. And in this context, it does, because again, we're looking at the fact and duration of confinement, where no conditions within the prison would remedy the constitutional injury. And Brown v. Plata is entirely consistent with this framework. Plata started as a classic conditions case, the typical medical treatment or mental health treatment issue within a prison. And over years of litigation, over years of looking at possible remedies, eventually arrived at the place where this case started, which is to say that there is no conditions change within the prison that would remedy the constitutional injury. And in the Supreme Court decision, you'll note that Justice Scalia stated in dissent that this was effectively the equivalent of habeas relief. And as this court has recognized, there can be some overlap there. Habeas relief can have an overlapping jurisdiction with the classic conditions of confinement. Isn't a more accurate way to describe what has gone on here is that there's been no exploration about whether there are other alternatives. I mean, you know, you accept the structural limitations of this facility, but it seems, I mean, we built hospitals on an emergency basis during COVID-19. The former office building in my city, Memphis, has been converted into a hospital. Presumably prison, if we can get more hospital space like that, presumably you might explore whether you could get more prison space at a particular location. And the way you would do that with the district court would be through a section 1983 case. The government has offered only hypothetical solutions to this concern. It was alleged in the petition and demonstrated through expert evidence and again, the CDC guidance and also Attorney General Barr's memorandum that social distancing is the indispensable lichpin of any response to a COVID-19 outbreak. You know, everybody has filed affidavits in this case, and that's as far as they go. I mean, the record in this case is exceptionally thin given on both sides, given the nature of the relief that was awarded. Many of the core facts leading up to Judge Gwinn's decision are undisputed, one of which is that social distancing is completely impossible. I would agree with you that that appears to be undisputed, but the record is just silent as to alternatives as far as I can tell. It was a nature of the- I have another point to, as you and Judge Gibbons are considering that, Mr. Carroll, another point is about how is that considered in the realm of wantonness? Don't we evaluate that with regard to the constraints facing the official? The toothbrushing elbow to elbow, you know, that kind of thing. It's a constraint, and it's a reality, right? It's a constraint, but it is also the case that the Bureau of Prisons has access to a number of tools provided to it to remedy this situation. And that's what the Attorney General was talking about in the April 3rd memorandum when he said Elkton must move with dispatch to consider people for home confinement to get them out of Elkton to enable that social distancing. So those are among the tools at their disposal. So to the point that was raised earlier about whether they were using those tools, within that space between April 3rd when the memorandum was issued and April 22nd when the district court issued its injunction, there were 38 people who were reviewed for home confinement within Elkton out of approximately 2,300. At that pace, it would take approximately three and a half years to complete a review for home confinement of everyone within Elkton. They were not complying with the instruction from the Attorney General, and they were not weapons that were available to them to fight the outbreak within the prison. So the deliberate indifference comes from the failure to test, which, as the district court noted, was incongruent with what was going on right there elsewhere in Ohio where they were engaged in mass testing. And the district court was equally mystified as to why that was the case. In the injunction, he stated, why has the Justice Department allocated Elkton an entirely insignificant number of tests while Ohio has been able to pull off mass testing not only in Maryland but at multiple institutions? And simultaneously, the outbreak... Swain and Valentine were raised earlier. They don't stand for the proposition that the nature of the outbreak is irrelevant. It provides context. So the outbreak in Elkton was... itself raises concerns about the awareness to the risks of the government. So, for example, just looking at death rates comparatively, the United States as a whole has suffered 32 deaths per 100,000 of population, according to Johns Hopkins. The worst rate for which they have data is the United Kingdom, which is 59 per 100,000. Elkton had 260 per 100,000 at the time of the district court's order. So the Attorney General had instructed them to use home confinement with dispatch. They were not doing it. Testing was not being made available for reasons that were never explained. And the outbreak was increasing in severity with six people dead. So based on that, it is within the framework of Farmer v. Brennan and the delivering a different standard to determine whether the prison was exercising... was exhibiting conscious disregard of a known risk. So that is the wantonness framework that Your Honor refers to is essentially a recklessness standard. Were they aware of the risk? Yes, they were. And did they disregard it? Yes, they disregarded the instructions of the Attorney General to remedy it. So that is how we get to subjective and deliberate indifference on this record. And to answer Your Honor's earlier question about the standard, to the extent that the court is looking at facts, making facts determinations, that is on a clear error standard. So to the extent that the district court extrapolated from that record to determine based on circumstantial evidence that subjective knowledge of the risk existed and subjective knowledge that the measures, the half measures that they were taking were not working, that is a permissible use, and it's entitled to a clear error standard of review. Well, the mixed question of law and fact, isn't it? I mean, you have to find what the facts are that determine whether they meet the legal standard. And if it's a mixed question of law and fact, it would be reviewed to no vote, correct? Yes, but if it determines... The core question is whether the government was aware of the risk, that is a fact question. And if the core question is whether the government was aware that their countermeasures were not working, that is a fact question. And this court has observed, of course, in Dara v. Krischer, Richmond v. Hawk, and other cases that simply proceeding with a measure that is known to be doomed to failure constitutes deliberate indifference. We have a counsel, we have a... We're interested in that standard of review and came to find this Mehra case, M-E-H-R-A, Williams v. Mehra. So it's 186 F. 3rd, 685. But that one, that's case Spogs wrote for the Embank Court and concluded in a sort of quite an analogous matter that the standard review was before mixed... Obviously, that it was a mixed question of law and fact. Meriting, of course, de novo review. So I bring that to your attention because that has hours. I see. Well, Your Honor, I would say that to the extent that you're extrapolating a legal conclusion out of facts, that might be a legal determination entitled to de novo. But that core factual determination is a question of simply who knew, whether there was subjective knowledge of a particular risk or a particular efficacy of a countermeasure. So I submit that that remains a factual determination entitled to that clear error review. So regarding the one point that Your Honor raised earlier about other possible solutions here, the government has raised possible hypotheticals of that nature. So for example, the possibility of everyone except the medically vulnerable subclass. And in response to that, we're dealing with the realities of the situation, which is that there is no solution that has been proposed by the government that might possibly remedy the constitutional injury within Elkton. And that was the allegation. And there has been no information to suggest otherwise before the district court. So I would submit that it can't be an abuse of discretion to conclude based on unrebutted evidence that there is no conditions change that would remedy the situation. Your understanding, Mr. Carey, and I know we're sort of going back and forth of sort of what existed as of April 22 and what occurred afterwards. But do you know if there's like sort of a final decision from Elkton as to the number of prisoners who are, I guess, eligible. They've been evaluated and are eligible for home confinement in line with the attorney general's memorandum. I heard the number five. I don't know if that's five out of 837 or five out of a much smaller number of you are requesting it. At the time of the district court's order on April 22nd, there were 38 people reviewed. Six were deemed eligible. Zero at that point had been actually moved out. Well, eligibility depends not just on whether they might be eligible, but a lot of other things as well, like a release plan. I mean, the inmate has to have somewhere to go where it would be appropriate for him to be where he would not be in a setting where he would be infecting others. I mean, there are a lot of steps after determining possible eligibility. Isn't that correct? That is correct. And to the point of deliberate indifference, the issue is largely the sluggish review of people under the home confinement standards. That rate that I was talking about, about how 38 people were reviewed. And but the larger point, of course, is that the district court structured its order to understand the point that Your Honor just raised, that there is a lengthy review that needs to go on here. Those evaluations were happening. And as counsel stated before, the district court did not give a date certain by which these transfers must occur. It structured the entire order to piggyback essentially on BOP's own internal processes as instructed by the attorney general to maximize the use of home confinement, to move people away from Elkton, to cure the constitutional injury. So that the purpose there was to simply make it as simple for BOP as possible to use its own processes while also preserving the constitutional rights of the prisoners within Elkton. So that is the, it has been raised by the government in the context of equities, that the argument that BOP's discretion essentially is unreviewable. But in this particular context, the limits on that discretion are set by the constitution. The district court is simply reviewing whether the exercise or failure to exercise that discretion is inconsistent with the Eighth Amendment. And under any number of doctrines set by the Supreme Court, such as INS versus St. Cyr and elsewhere, this federal courts should not interpret statutes of that nature to be unreviewable where the result would be a constitutional violation, particularly in habeas. Okay, any further questions? Thank you, Mr. Carey. Ms. Carroll, do you have five minutes of rebuttal? Thank you, your honor. I just have four quick points I would like to make. First, I want to point out that early on, my colleague, Mr. Carey referred to Elkton and sort of emphasized the fact that it's a low security facility. It's true that it's low security, but it's not minimum security. I want to make sure that's clear. Second, Mr. Carey told the court that Jalili, this court's decision in Jalili says that challenges to the place of confinement are cognizable under 2241. The holding of Jalili was that places, challenges to the place of confinement are not cognizable under 2255. There is dicta in Jalili that perhaps could be read to suggest that they may be cognizable under 2241, but there is no explanation of that point. It cites one out of circuit case that involved parole, which is very different from transfer from one prison to another. The case from this court that's on point is instead Martin v. Overton, in which this court held that a petitioner could not assert a habeas claim seeking transfer to another prison for medical treatment. And I would also note that Jalili, for what it's worth, involved a dispute about whether an inmate should be in a community treatment center as opposed to a prison, which is pretty different from being transferred just from just one prison to another prison that's perhaps even higher security. I also want to third respond to Mr. Carey's point that this is a fact, a challenge to the fact of confinement because no change in conditions could remedy the violation. Mr. Carey tried to rely on Brown v. Plata for the point that that's still a habeas challenge. I think that's what I heard him saying because he noted that in Brown v. Plata, the Supreme Court noted that there had been sort of increasing measures to try to fix things. And at the end, it was determined that prisoners needed to be transferred. And he noted that Justice Scalia in dissent said that this was essentially a habeas claim, but the majority of the court treated it as a prisoner release order under the PLRA. And I think that Judge Gibbons is exactly right that the way a suit of this kind is supposed to proceed is as in here, not a section 1983 claim, I suppose, because the federal government, but as an APA claim or something of that nature in which the carefully circumscribed limits of the PLRA are applied and in which the court, for example, as I think Judge Gibbons also noted, takes evidence on whether there are narrower forms of relief that could remedy any potential violation that the court thinks it sees. It's of course, not our burden in the government to disprove the possibility of narrower alternatives to show that petitioners shouldn't succeed on their Eighth Amendment claim. Under the PLRA, it's supposed to be petitioner's burden and the district court's job to think about whether there are narrower remedies, even assuming that there is a violation. And that leads to my final point that I want to make, which is that there has been no Eighth Amendment violation here. BOP has worked diligently and in good faith for months to protect inmates within the inherent constraints of the prison setting. Mr. Carey suggests that BOP acted wantonly. I think he's saying that BOP acted wantonly because it should have released more people to home confinement. But as I explained, it's not an easy available alternative to release people to home confinement that pursuant to BOP policy and directions of the attorney general are considered to pose a public safety threat such that their release to home confinement would not be appropriate. I know this doesn't, we're talking about the April 22 order, but so is the final number for possible release for home confinement out of 837 medically vulnerable prisoners, five. Is that the number five have been deemed to be eligible for release to home confinement? Your Honor, I wish that I knew the exact number off the top of my head. I really should know that. I know that as Mr. Carey said, at the time of the preliminary injunction, six people had been identified as eligible for home confinement. It's true that they hadn't yet been actually let out on home confinement, but they had been found eligible. And I believe that there were some more after that, but I'm very sorry. I think there was one eligible for compassionate release. That was sort of a total of six, but well, we're talking about some things in the record that occurred after April 22, but they're part of the order that was issued on April 22 in terms of- So the lawsuit was filed on April 4th Am I remembering that correctly? It was in April. I'm sorry that I guess I could- And then the district court had a hearing on either the 17th or the 18th. And a few days later, the court issued its injunction. Is that, have I got the sequence right there? So at the time that there were six people, the lawsuit had been pending around two weeks. I'm not positive of the exact dates, but that timeframe sounds generally right to me. And the district court didn't even have PI briefing. All that was before the district court was the habeas, putative habeas petition, EOP's answer to the petition, which attached some declarations and a petitioner's reply. So the district court did move quite hastily and it certainly didn't do the type of analysis that's required under the PLRA. Returning to the eighth amendment point, I just want to, I'm sorry, I'm out of time. Should I, should I- Oh, you may take another 30 seconds if you wish. Thank you, your honor. Returning to the eighth amendment, I want to point out that the cases that petitioners cite in their brief in this court involve things like, for example, the denial of toothpaste to inmates. I think it's hard to argue that it's, that there are very significant institutional constraints that prevent a prison from giving an inmate toothpaste. That seems like something that is, that can be done. Here, the alternatives that petitioners are focused on seem to include things like releasing people on home confinement that BOP does not think should be on home confinement, transferring people to other prisons when, you know, they might be traveling very far, very far from their families, very far from their homes. They might be moving to higher security institutions than they otherwise would be in. They would be moving to other places potentially that are just not as well suited for them. And BOP's decision not to do that is an entirely reasonable one that does not in any way reflect a wanton intent to inflict harm. I'm happy to answer any further questions. Apparently there are none. We thank you for your argument. Actually, Mr. Kerrion, Ms. Carroll, we thank you both for your arguments this afternoon and your flexibility in presenting arguments by way of video. The technology seems to have worked quite well. Not always the case, though it's usually been the case. Anyway, the case will be submitted and we'll have a decision for you short. With that, Mayor, you may adjourn court. This honorable court is now adjourned.